**Page 1**

UNITED STATES DISTRICT COURT

CASE NO. 8:05-cv-2158

SOUTHERN FAMILY INSURANCE COMPANY,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

_____

COPY

DEPOSITION OF:        JAMES NEWMAN

TAKEN AT THE INSTANCE OF: The DEFENDANT

DATE:                 July 11, 2007

TIME:                 Commenced at 10:41 a.m.
                      Concluded at 11:24 a.m.

LOCATION:             111 North Adams Street
                      Tallahassee, FL

REPORTED BY:          JUDY CHIN
                      RPR, CRR

**Page 2**

```
 1    APPEARANCES:

 2

 3             REPRESENTING PLAINTIFF:

 4

 5             RICHARD A. ALAYON, ESQUIRE

 6             ALAYON and ASSOCIATES, P.A.

 7             4551 Ponce de Leon Boulevard

 8             Coral Gables, Florida  33146

 9

10             REPRESENTING DEPT OF FINANCIAL SERVICES:

11

12             STEVEN G. BRANGACCIO, ESQUIRE

13             DEPARTMENT OF FINANCIAL SERVICES

14             20 Capital Circle, SE

15             Tallahassee, Florida  32301

16

17             REPRESENTING DEFENDANT:

18

19             MICHAEL N. WILCOVE, ESQUIRE

20             U.S. DEPARTMENT OF JUSTICE

21             555 4th Street, NW

22             Room 6233

23             Washington, DC  20001

24

25
```

**Page 3**

```
 1                          INDEX

 2    WITNESS                        PAGE

 3    JAMES NEWMAN

 4

 5    Direct Examination by Mr. Wilcove        4

 6    Cross Examination by Mr. Alayon         22

 7

 8    CERTIFICATE OF OATH                     30

 9    CERTIFICATE OF REPORTER                 31

10    ERRATA SHEET                            32

11    READING AND SIGNING LETTER              33

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 4**

```
 1                    STIPULATIONS
 2          The following deposition of JAMES NEWMAN
 3    was taken on oral examination, pursuant to notice,
 4    for purposes of discovery, and for use as
 5    evidence, and for other uses and purposes as may
 6    be permitted by the applicable and governing
 7    rules.  Reading and signing is not waived.
 8                        *   *   *
 9    Thereupon,
10                    JAMES NEWMAN
11    was called as a witness, having been first duly
12    sworn, was examined and testified as follows:
13                 DIRECT EXAMINATION
14    BY MR. WILCOVE
15         Q    Mr. Newman, I know you are very familiar
16    with depositions.  Just a couple quick reminders.
17    I don't feel the need to go through the whole
18    litany.  If you don't understand any of my
19    questions, please tell me so.  If you need to
20    clarify an answer or correct an answer that you
21    gave earlier, just speak up at any time.  If you
22    need to take a break at any time, tell me so.
23         A    Okay.
24         Q    Can I have your name, sir.
25         A    James W. Newman, Junior.
```

**Page 5**

1      Q     Do you go by Jay?

2      A     Jay is a life-long nickname.

3      Q     Can I have your address, please.

4      A     1101 Old Fort Drive, Tallahassee,

5    Florida.   32301.

6      Q     What sort of work are you doing now,

7    sir?

8      A     For the last few years, I've been doing

9    independent consulting projects, various kinds of

10   projects for different clients.

11     Q     What nature were the projects?

12     A     Well, they have included a couple of

13   instances where I was served as sort of an expert

14   witness, but most of the work has been consulting

15   on residual market, Florida insurance hurricane

16   issues, property insurance matters.  I've also

17   done some work to assist people in buying and

18   selling insurance companies and raising capital to

19   finance insurance companies.

20            I did a special project for the Florida

21   Association of Insurance Agents on property

22   insurance in Florida.  Just a variety of activity.

23            Oh, I did a report for the Office of

24   Insurance Regulation about a year and a half ago

25   dealing with one particular aspect of the

Page 6

```
 1   homeowner's insurance policy that was required by
 2   the legislature.
 3        Q    How long have you been an independent
 4   consultant, sir?
 5        A    Since January of 2004.
 6        Q    And before you became an independent
 7   consultant, where did you work, sir?
 8        A    Immediately before that I was the
 9   executive director of Citizens Property Insurance
10   Corporation, and immediately prior to that, really
11   as a continuation, executive director of the
12   Florida Residential Property and Casualty Joint
13   Underwriting Association.
14        Q    Which we will refer to as the JUA?
15        A    That's fine.
16        Q    Is that what it was commonly referred
17   to?
18        A    JUA, or the residential JUA.
19        Q    And did Citizens Property and Insurance
20   Corporation assume the responsibilities and the
21   role of the JUA, among other things?
22        A    Well, the JUA basically morphed into
23   Citizens, and then the only other change -- the
24   main other change that occurred, the Florida
25   Windstorm Underwriting Association also became
```

Page 7

1    part of Citizens at that time, which was in 2002.

2        Q     And what position did you hold at the

3    JUA?

4        A     Executive director.

5        Q     For how long did you hold that position,

6    sir?

7        A     At the JUA, for seven and a half years;

8    from January of 1995 until August 1 of 2002.

9        Q     And before that, where did you work?

10       A     Before that I had worked for a small

11   insurance company -- insurance management company

12   in Tallahassee that managed some professional

13   liability insurance companies.  I had done that

14   for about two years before joining the JUA.

15       Q     When you joined the JUA, did you assume

16   the role as executive director?

17       A     Yes.

18       Q     And before you worked for the small

19   insurance management company --

20       A     Yes.

21       Q     -- where did you work, sir?

22       A     For the seven years before that, I

23   worked for Cigna Property Insurance Corporation.

24       Q     And what did you do for them?

25       A     I was with --

```
 1              I started in 1985 in Philadelphia, at

 2    the headquarters, and in charge of state

 3    government affairs, for Cigna Corporation, all

 4    lines of insurance, and that was four years.

 5              Then I had an assignment in a different

 6    part of the company, more of an administrative

 7    position for a year, and then I moved to -- was

 8    transferred to Macon, Georgia, where I was in

 9    charge of a business operation in a Cigna office

10    in Macon, Georgia.

11        Q    And before working for Cigna, where did

12    you work, sir?

13        A    Senior vice president for American

14    Insurance Association, which is an insurance

15    company trade association principally of large

16    property and casualty insurance companies.

17        Q    And before that, where did you work,

18    sir?

19        A    I was an insurance commissioner of the

20    Commonwealth of Virginia for three years.  We are

21    back now to the 1978 to 1981, when I was an

22    insurance commissioner.  I was deputy insurance

23    commissioner starting in 1976 up through 1978.  In

24    1976 is when I first got involved in insurance.

25        Q    So you have been involved with insurance
```

Page 9

1    from 1976 through the present?

2        A    Yes.   Thirty-one years.

3        Q    And as executive director of the JUA,

4    did everybody within the JUA ultimately report to

5    you?

6        A    Yes.

7        Q    And who did you report to, sir?

8        A    Well --

9        Q    I don't necessarily mean names.

10       A    I technically reported to the chairman

11   of the board, to the board of directors.  But the

12   insurance commissioner of the State of Florida had

13   considerable control over the JUA and my

14   activities and the board, so it was debatable as

15   to who I really reported to.

16       Q    Did there come a time when the Florida

17   Legislature directed the JUA to depopulate itself?

18       A    In the 1995 legislative session, the

19   Legislature enacted new legislation that would --

20   it authorized takeout bonuses, what we referred to

21   as depopulation programs or takeout programs.

22   That was first done in 1995.

23       Q    Could you generally tell me what a

24   takeout program is.

25       A    Yes.   The legislation was a little

Page 10

```
 1   vague.  It just talked about removing policies

 2   from the JUA.  But in practice, it involved two

 3   types of approaches.

 4           I'll mention the least common one first,

 5   and that was where policies would be identified

 6   for a particular company, and the company -- as

 7   those policies reached their termination date in

 8   the JUA, the other company would make an offer to

 9   that policy, and then they would -- they could not

10   refuse to take it and come back to the JUA.  They

11   had to either take that offer from that company or

12   go find insurance someplace else.

13           Most of the policies were taken out

14   through what we called assumption programs, where

15   rather than have this done at each policy's

16   renewal over a 12-month period, we would identify

17   the policies, and as of a certain date all those

18   policies would be -- the claims responsibility for

19   all of the policies would be contractually

20   transferred to the assuming company, and any

21   losses -- any covered losses for any reason that

22   occurred on and after that date were the

23   responsibility of the assuming company.

24           There was a variety of financial

25   transactions that occurred during that -- as a
```

Page 11

1    result of that, and there was a lengthy agreement

2    that were involved to set forth the rights and

3    obligations of the JUA and the assuming company.

4         Q     Southern Family Insurance Company, are

5    you familiar with that entity?

6         A     Yes.

7         Q     Did they participate in the assumption

8    takeout program?

9         A     Yes.

10        Q     And would you explain what the takeout

11   bonus is.

12        A     Well, initially, and I'm not sure

13   whether it is still in the law, it may be, in 1995

14   the Legislature authorized the JUA to pay up to

15   $100 per policy for any policies that were removed

16   from the JUA by an insurance company as long as

17   certain requirements were met.  They were spelled

18   out in the statute.  One of those requirements

19   being that the company had to keep the policy,

20   could not terminate the policy during a three-year

21   period following the takeout or the removal of the

22   policy.

23             And so the JUA, to carry out that

24   statutory requirement, set up an escrow account

25   for each company in which the JUA would pay the

Page 12

```
1    estimated amount of the bonus into the escrow

2    account, which it stayed there until the JUA --

3    until three years went by and the JUA was then

4    able to determine using various auditing methods

5    and reporting methods whether the company had

6    complied with the three-year requirement, in which

7    time that was done, and there was a re-calculation

8    of using statistical audit methods to try to

9    estimate the actual number of policies that were

10   kept for three years, and based on that then the

11   actual amount of the bonus due to the insurance

12   company was re-calculated -- or was calculated,

13   excuse me, and the amount was paid over to the

14   company along with investment income that had been

15   earned on the funds that were in the escrow

16   account.

17        Q    I don't want to spend too much time

18   going through the background of how the program

19   worked, because it is spelled out in the statute.

20   I'm asking these questions for flow.

21             Just to clarify on the record, there

22   were certain instances such as nonpayment of a

23   premium or fraud where the private insurer could

24   cancel the policy and not forfeit the bonus if it

25   then took over a different policy, is that
```

Page 13

1    correct?

2         A     Yes.   In the statute, that was permitted

3    by the statute.   It was also permitted in the

4    contract, the agreements that we had with the

5    companies.

6         Q     There's more than one assumption takeout

7    program, is that correct?

8         A     Yes.

9         Q     Generally speaking, who set -- who

10   determined the amount of the bonus under each

11   individual program?

12        A     Well, the initial programs were entirely

13   done under the specific statutory authority that I

14   described earlier, the so-called up to $100 per

15   policy program, which I always referred to as the

16   statutory takeout program.

17             The Legislature in its wisdom had

18   enacted another provision granting to the JUA

19   board the ability to be more creative, to adopt

20   other types of programs if it felt like

21   additional -- different provisions were needed in

22   order to get more policies out of the JUA.

23             As it turned out, most of the policies

24   taken out of the JUA were not taken out under the

25   statutory takeout program but were, in fact, taken

Page 14

1    out under various new programs that the JUA board

2    adopted under this general ground of authority

3    from the Legislature.

4        Q    Who determined the amount of the bonus

5    or the method of calculating the bonus under the

6    new programs?

7        A    Well, first, the --

8            I need to tell you this in order to

9    answer the other question:  The Legislature did

10   not say how to calculate the up-to-$100 per policy

11   bonus.  It just said up to $100.

12           I developed a particular formula in June

13   of 1995 that would implement that statutory

14   provision, and the board adopted that, and that's

15   what we used in the takeout that occurred under

16   the statutory program.

17           Later, when other programs were adopted,

18   they varied in their methodology, depending on the

19   circumstances.  Some of them included higher

20   dollar amounts for policies taken out from Dade,

21   Broward, Palm Beach County, so forth.  Those were

22   officially adopted by the board, by the JUA board.

23   They were done typically upon recommendation by me

24   as executive director; I would also say with the

25   full knowledge and concurrence and support of the

Page 15

 1    insurance department and the insurance

 2    commissioner, because we all worked together on

 3    those matters.

 4         Q    Could one insurance company demand that

 5    its bonus be calculated in a different manner than

 6    it was calculated for other insurance companies?

 7         A    Well, the JUA adopted various programs

 8    over time.  Some of those were influenced by

 9    insurance companies who would go to the insurance

10    commissioner and say, you know, we want to do

11    something, but we have to have more bonus dollars

12    and so forth, and as a result of various

13    discussions --

14              This is one of the reasons how new

15    programs got created.  There was a process of

16    discussion and feedback and so forth, but once the

17    board approved a particular program, then the

18    parameters for that program were fixed, with one

19    exception; each of the assumption-type programs

20    involved something called a seating commission.

21    This is a little technical.  I'm trying to be

22    complete in answering your question.  It had

23    nothing to do with the bonus amount, because that

24    was -- once the board approved a bonus arrangement

25    for a particular program, then that program --

Page 16

```
 1    that was the way the bonus was calculated for that
 2    program.
 3              But something that did vary
 4    theoretically and in actuality from company to
 5    company was a seating commission.  When an
 6    assumption occurred, the JUA was paying over the
 7    unearned premium associated with all of the
 8    policies that were being assumed.  And since the
 9    JUA was actually continuing to be responsible for
10    the policy administration of those policies, and
11    the premium taxes and the agent commission, we
12    needed to keep certain amount of monies out of the
13    unearned premium in order to cover those costs.
14    Well, those costs differ from company to company.
15              In the early years when we were doing
16    that, there was negotiation as to what that should
17    be.  I tried to limit that over time and came up
18    with a process by which I told the companies that
19    the seating commission was going to be set at a
20    certain number unless they could come in and show
21    that their expenses were higher than that, and
22    then I would pay them -- the seating commission
23    would be adjusted to reflect their actual
24    expenses.  As I said, that's not the same as the
25    takeout bonuses, but that is a place where there
```

**Page 17**

 1   was negotiation, and there was some discussion at

 2   least for--in many of the cases.

 3        Q    Now, the JUA had an unearned premium

 4   reserve for the policies that it was holding, is

 5   that correct?

 6        A    Yes.

 7        Q    And could you just define -- I know this

 8   is a complicated issue -- but just in simple terms

 9   what an unearned premium is.

10        A    It's the --

11             Looking at it on an individual policy

12   basis, which is the easiest way to understand it,

13   it is the proportional amount of the premium that

14   is associated with the -- from any point in time

15   until the policy reaches its expiration date.  So

16   if a policy has been in force for six months, then

17   50 percent of the premium would have been earned

18   and 50 percent of the premium would be in the

19   unearned premium reserve.

20        Q    So in very simple terms, if somebody on

21   January 1 takes out a policy and pays a premium of

22   $120, at the end of January $10 of that premium

23   would then have been earned, is that correct?

24        A    Yes.

25        Q    And then $110 would not have been

Page 18

1    earned?

2         A     That's correct.

3         Q     At the end of each month, $10 more

4    becomes earned, is that correct?

5         A     Yes.

6         Q     And when Southern Family or an insurance

7    company assumed policies under one of these

8    takeout programs --

9              Let me backtrack.

10             Unearned premium reserve, that is a

11   liability of companies, is it not?

12        A     Yes.  It shows up on the balance sheet

13   of an insurance company under the liability

14   section of the balance sheet.

15        Q     When an insurance company assumes

16   policies under one of the JUA takeout bonus

17   programs, it also took over the unearned premium

18   reserve liability that the JUA had, is that

19   correct?

20        A     Yes.

21        Q     And the JUA also gave the company cash

22   equal to the amount of that reserve liability, is

23   that correct?

24        A     Yes.  Less the seating commission I

25   referred to earlier, but yes.

1      Q     And then over time the assuming company

2    would then have its unearned premium reserve moved

3    over to earned premium reserve over time?

4      A     Yes.

5      Q     And then it would either enjoy a profit

6    or not depending on what the claims turned out to

7    be?

8      A     Yes.

9      Q     The statute provided that the assuming

10   company would have to credit the takeout bonus to

11   its capital and surplus account, is that correct?

12     A     My recollection is in 1996 there was an

13   amendment that was adopted -- or language was

14   included in legislation that said that.

15     Q     Can you define what a capital and

16   surplus account is?

17     A     Well --

18     Q     Or what the term means.

19     A     In simple terms, it is the result of

20   when you subtract liabilities from assets on a

21   balance sheet, it is the remainder.  It is the net

22   worth, sometimes referred to as net worth of the

23   company, the residual amount that's available for

24   the owners of the company or to be available to

25   meet unexpected demands for payments or whatever.

**Page 20**

```
1    The capital and surplus is the insurance term.  In

2    general business language, it is referred to as

3    net worth.  Those are the same.

4        Q    So depending on what the insurance

5    company's liabilities and expenses were, cash

6    received from premiums could work its way into

7    surplus, could it not?

8        A    Yes.

9        Q    And then when the assuming company

10   received a bonus, the cash -- it would debit the

11   cash, is that correct?

12       A    No.

13       Q    What would it do?

14       A    You would -- I think the term would be

15   credit the cash.

16       Q    Credit the cash.

17       A    Because the cash goes on the cash side.

18   If the liabilities are exactly the same as they

19   were before, on the right-hand side of the balance

20   sheet, then it shows up as -- in the capital and

21   surplus accounts.

22       Q    Is there any other place on a balance

23   sheet that a bonus payment could be credited to

24   other than capital and surplus that you can think

25   of?
```

Page 21

```
 1        A     Well, at the instant that it is
 2   received, I think the answer is no.   Like I say,
 3   the cash goes on the asset side.   Instantaneously
 4   there is a number that shows up on the capital and
 5   surplus account --
 6            MR. ALAYON:  Can I ask a quick question?
 7        I thought I heard the testimony from
 8        Mr. Newman that in his understanding the
 9        accounting by the receiving company of this
10        bonus would be to credit cash and debit
11        something.  I don't think that's what he
12        meant.  Is that what you meant?
13            THE WITNESS:  Well, leaving aside the
14        technical accounting terms, at the instant
15        the cash is -- the bonus is received, it is
16        in the form of cash, it shows up in the cash
17        account on the asset side of the balance
18        sheet.  At that instant it would show up in
19        the capital and surplus account on the
20        right-hand side of the balance sheet.
21            MR. ALAYON:  To be clear, when you say
22        it shows up, would it increase or decrease --
23            THE WITNESS:  Both would be increased by
24        the same amount.
25            MR. ALAYON:   Increase cash by the bonus
```

Page 22

```
 1        and increase capital and surplus by the

 2        bonus?

 3               THE WITNESS:  Yes.

 4               MR. ALAYON:  The T-account format, the

 5        way the books are balanced, you balance your

 6        books?

 7               THE WITNESS:  Yes.

 8               MR. ALAYON:  Okay.  Thank you.

 9   BY MR. WILCOVE

10        Q     Did the JUA ever direct Southern Family

11   Insurance Company as to what it should use the

12   bonus payments for?

13        A     No.

14        Q     Did it ever take any position as to how

15   the company -- what the company should do with its

16   bonus payments once it received them?

17        A     No.

18        Q     Did the JUA direct Southern Family as to

19   how to use any cash that it received from any

20   source?

21        A     No.

22               MR. WILCOVE:  That's all I have.

23                  CROSS EXAMINATION

24   BY MR. ALAYON

25        Q     As the director of the JUA --
```

Page 23

```
 1            Actually I have a line of questions.
 2            As the director of the JUA --
 3      A     Executive director was my title.
 4      Q     Excuse me.  As the executive director of
 5   the JUA, did you work for the Office of Insurance
 6   Regulation as well?
 7      A     Well, I made reference to that
 8   earlier --
 9      Q     Work, meaning did you receive a paycheck
10   from the Office of Insurance Regulation?
11      A     No.
12      Q     Were you classified as an employee, to
13   your knowledge, for any of the benefit plans
14   enjoyed by the employees of the Insurance
15   Regulation?
16      A     No.
17      Q     So for all intents and purposes, would
18   it be fair to say that you were solely an employee
19   of the JUA?
20      A     Yes.
21      Q     And in your role as being solely an
22   employee of the JUA, did you have occasion to
23   review, receive or otherwise comment on any
24   restrictions imposed on the use of these takeout
25   monies by the Office of Insurance Regulation?
```

Page 24

```
 1        A     Would you repeat that question?

 2        Q     In other words, are you aware of any

 3   consent orders that were entered into by Southern

 4   Family Insurance Company that governed the use of

 5   the monies that were paid as bonuses?

 6        A     I don't recall any of those.

 7        Q     So would you know of the existence of

 8   any of those if you were not an employee of the

 9   Office of Insurance Regulation?

10        A     Sometimes we would get copies of consent

11   orders, but not always.  Those consent orders were

12   between the insurance department and the insurance

13   companies and generally had no relevance for the

14   JUA.

15        Q     Okay.  Now, in your role as an employee

16   of the JUA, do you know if you were subject to any

17   rules that existed generally that applied to

18   insurance companies that were regulated by the

19   State of Florida?

20        A     Are you asking about me personally or

21   the JUA?

22        Q     I apologize.  The JUA.

23        A     Okay.  The JUA was subject to numerous

24   provisions of the insurance code, not all of them,

25   because we actually had a letter from the general
```

Page 25

```
 1    counsel of the insurance department saying that
 2    the capital and surplus requirements imposed on
 3    insurance companies were not applicable to the
 4    JUA.
 5              But in terms of the general day-to-day
 6    operations of the JUA, we did follow generally the
 7    same laws and regulations applicable to insurance
 8    companies, because we were, in fact, providing an
 9    insurance policy.  The policyholders were
10    expecting a certain level of service and so forth,
11    and so everyone --
12              I mean, I don't know whether there was
13    ever anything official on that.  I don't remember
14    whether the statute ever said specifically that
15    the JUA is subject to everything except this; I
16    don't recall that.
17              I don't recall whether the insurance
18    department itself ever wrote a letter and said you
19    are subject to everything except such-and-such.
20    They did say that specifically with respect to the
21    capital surplus requirements.  I think it was just
22    generally understood that the JUA would operate on
23    a day-to-day basis much the way an insurance
24    operated.
25         Q    So if you were operating like an
```

1   insurance company, and you were regulated by the

2   state laws of the State of Florida, would you not

3   have been subject to, and would your payments to

4   these insurance companies not have been subject to

5   the statute that was amended in 1996 that required

6   them to treat those payments as capital?

7          MR. WILCOVE:  Let me note an objection.

8       The statute I don't believe says it has to

9       treat those payments as capital.

10          Go ahead.

11  BY MR. ALAYON

12      Q    You testified earlier as to amendment to

13  the statute in 1996 that directed the insurance

14  companies who received these bonuses to book the

15  bonuses as capital or surplus.  Do you remember

16  your testimony?

17      A    Yes.

18      Q    Would you like to change your testimony

19  now in light of comments by opposing counsel?

20      A    The statute speaks for itself.  My

21  recollection is that it -- and I think Wilcove

22  asked me a question that was motivated by the

23  language of that statute that said that it is to

24  be credited or deposited into, or some term, the

25  capital surplus account of the insurance company.

```
 1       Q    To your knowledge, could you as
 2  executive director of the JUA draft a document,
 3  whether you call it an exemption or permission
 4  slip, like maybe you used to get in school when
 5  you wanted to go to whatever facility you would
 6  want to use, that said even though the statute
 7  says you have to book it as capital and surplus,
 8  you don't really need to, when you were issuing
 9  the bonuses to other companies?
10            MR. WILCOVE:  When you say "you," who is
11       the you?
12  BY MR. WILCOVE
13       Q    You as executive director, that's what I
14  was referring to.
15       A    Well, let me see if I can answer the
16  question.
17            The JUA followed the statute in terms of
18  the way it administered the takeout bonus program,
19  and that included at some point paying a certain
20  amount of bonus to a company that had qualified
21  for and had met the requirements of the takeout
22  bonus programs.  And we simply wired them the
23  money.  After that, we had no interest, no
24  involvement whatsoever in what happened after
25  that.
```

Page 28

1       Q      After they met the requirements?

2       A      After they --

3              After we had gone through a process to

4    determine that, to the best of our ability, to

5    determine that the requirements of the statute and

6    the requirements of the agreements that were

7    entered into between the two parties had been met

8    for certain number of policies, we then applied

9    whatever the applicable formula was in that case

10   and came up with a bonus amount to be paid, and we

11   wired that amount of money to the company.  That's

12   all we did.

13      Q      And because you were not an employee of

14   the Office of Insurance Regulation, it would seem

15   logical that you wouldn't follow that company's

16   compliance with the statute, correct?

17      A      We did not comply --

18             We had no interest in what happened

19   after we wired the money.  We had satisfied our

20   requirements under the statute and the agreements

21   that we had with the company when we wired them

22   the money.

23      Q      Do you have any direct personal

24   knowledge as to whether the Office of Insurance

25   Regulation would not follow the compliance of the

**Page 29**

```
 1    statute by the receiving companies after you wired

 2    the money?

 3        A    I don't have any information about that

 4    or any reason to believe that the law was not

 5    followed.

 6             MR. ALAYON:  Thank you.  That's it.

 7             (The proceedings concluded at 11:24)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```