IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SOUTHERN FAMILY INSURANCE COMPANY,

        Plaintiff/Cross-claim Plaintiff,

vs.

UNITED STATES OF AMERICA,

        Defendant,

                         /        Case No.
        8:05-CV-2158-JSM-MAP

POE FINANCIAL GROUP, INC.,        (Consolidated)

        Plaintiff/Cross-claim Defendant,

vs.

UNITED STATES OF AMERICA,

        Defendant.

                         /

### POE FINANCIAL GROUP, INC.'S RESPONSE TO UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Poe Financial Group, Inc. ("PFG") opposes the United States of America's

Motion for Partial Summary Judgment on the issue of whether payments made by the State

of Florida Residential Property and Casualty Joint Underwriting Association ("JUA") to

Southern Family Insurance Company ("SFIC") are excludable from income as

nonshareholder contributions to capital.

### BACKGROUND

Florida's Property Insurance Crisis

In August, 1992, Hurricane Andrew caused insured losses in Florida of more than

$16 billion and devastated the Florida property insurance market.  (Expert Report of James

Newman, Ex. B, pg. 2).  Eleven insurance companies became insolvent, while others

withdrew from the Florida market.  (*Id.*, pgs. 2-3; Deposition of Jan Meder, Jr., (Dkt. 158),

pg. 143).  The Florida property insurance market was in crisis.  In some parts of the State,

new property insurance coverage was unavailable.  (*Florida's Property Insurance Crisis*,

1994 Interim Project Report, Florida House of Representatives, Committee on Insurance

("Committee Report"), pg. 1, attached to Newman Report as Ex. C).  In most other parts of

the State, new coverage was subject to limited availability.  (*Id.*).  There were numerous

policy cancellations, and insurers continued to express their intent to leave the State.  (*Id.*).

In response, the Florida Insurance Commissioner issued an emergency order

prohibiting insurers from cancelling Florida property insurance policies.  (Newman Report,

Ex. B, pg. 4).  The Florida Legislature also convened in a special session in December, 1992,

and created the JUA.  (Newman Report, Ex. B, pg. 7; Committee Report, pg. 1, attached to

Newman Report as Ex. C).  The JUA, designated as a political subdivision of the State,

provided property insurance coverage to persons unable to obtain coverage from private

insurers.  *See* § 627.351(6)(a), Fla. Stat. (1995).  The JUA was intended to be an insurer of

last resort.  The JUA's business, however, grew rapidly.  After only 18 months of operation,

the JUA had become the third-largest property insurer in Florida.  (Committee Report, pg. 1,

attached to Newman Report as Ex. C).  By the fall of 1996, the JUA had nearly 1,000,000

policies in force.  (Newman Report, pg. 6).  The JUA had not improved the market for

property insurance in Florida, but instead had become "a significant impediment to the

restoration of a stable and competitive residential property insurance market in this state… ."

§ 627.3511(1), Fla. Stat. (1997).

The Florida Legislature recognized the existence of "a compelling state interest in maintaining an orderly market for property insurance."  Chapter 93-401, Laws of Florida.  In a memorial to the United States Congress, the Florida Legislature proclaimed that "the inability of the private sector insurance and reinsurance markets to maintain sufficient capacity to enable residents of this state to obtain property insurance coverage in the private sector endangers the economy of the state and endangers the public health, safety, and welfare… ."  (House Memorial 4265, pg. 1, attached to Newman Report as Ex. D).

The Takeout Bonus Program

To address Florida's compelling state interest, the State of Florida created incentives for private insurance companies to re-enter the Florida market.  The Florida Legislature authorized payment by the State of a "bonus" to private insurers for each policy removed from the JUA ("Takeout Bonus").[1]  *See* § 627.3511(2), Fla. Stat. (1997).  The purpose of the Takeout Bonuses was to restore a stable and competitive residential property insurance market in Florida.  (Newman Report, pg. 10); *see also* § 627.3511(1), Fla. Stat. (1997).  An insurer applied to participate in the program by submitting a proposed takeout plan.  The terms of these plans were negotiated by the insurers, the JUA, and the Department of Insurance ("DOI").  (Newman Report, pg.14).  The DOI could reject an insurer's participation in the program if the DOI was dissatisfied with the degree to which the Takeout Bonuses promoted the insurer's allocation of new capital to the expansion and growth of its residential property insurance coverage in Florida.  *See* § 627.3511(2)(d), Fla. Stat. (1997).

---

[1]  The JUA developed several different programs pursuant to its statutory grant of authority. In all respects material to this motion, the programs were consistent with the statutory program outlined in Section 627.3511, Fla. Stat. (1997).

3

The Florida Legislature provided that the Takeout Bonuses could be paid in amounts up to $100 each. *See* § 627.3511(2), Fla. Stat. (1997). The Executive Director of the JUA, James Newman, developed a formula for determining the amount of the Takeout Bonus to be paid for each type of policy.[2] (Deposition of James Newman (Dkt. 159), pg. 14). The amount of bonus paid for each policy was not based on any consideration of, or desire to provide, increased revenue or a stated rate of return on investment to participating insurers. (Newman Report, pg. 14, Ex. O). Instead, the amount of a particular Takeout Bonus depended generally on whether the policy provided windstorm coverage and the location of the insured property. (Meder Depo. (Dkt. 158), pg. 31; Newman Report, pg. 14, Ex. O). The amount of the Takeout Bonus did not depend on the value of the property insured, the amount of coverage provided, the insurance premium charged for the policy, or the insurer's expected profit or loss on the policy. (*Id.*).

The particular formula developed for each of the various Takeout Bonus programs was the result of a process of discussion and feedback from insurers who wished to participate in the program. (Newman Depo. (Dkt. 159) pg. 15). Once the particular formula was approved, the payments under that program were no longer negotiable. (*Id.*). Insurers wishing to remove policies from the JUA, however, engaged in extensive negotiations regarding the portfolio of policies they were to receive. (Meder Depo. (Dkt. 158), pgs. 32-36, 139). There was significant competition among insurance companies to secure from the

---

[2] The categories included: i) policies in Dade, Broward, and Palm Beach Counties including wind coverage, ii) policies in Dade, Broward, and Palm Beach Counties excluding wind coverage, iii) policies in other coastal counties including wind coverage; iv) policies in other coastal counties excluding wind coverage; and v) policies in interior counties. *See, e.g.,* Takeout Bonus Review and Payment Agreement (Dkt. 1-7), pg.1

JUA policies that paid the highest Takeout Bonuses, but presented the lowest risk exposure. (Meder Depo. (Dkt 158), pgs. 32-36, 116, 139).

To participate in the Takeout Bonus program, insurers were required to remove at least 25,000 policies from the JUA. *See* § 627.3511(2), Fla. Stat. (1997). The statute provided that a policy could be removed by an insurer either upon the expiration of the policy previously issued by the JUA or during the term of an in-force policy. *Id.* Under Section 627.3511, Florida Statutes, private insurers taking over policies from the JUA were not permitted immediate access to the Takeout Bonuses. Instead, the JUA placed the Takeout Bonuses into an escrow account for a period of three years. § 627.3511(5)(a), Fla. Stat. (1997). A Takeout Bonus was released to an insurer only if the insurer had provided coverage under the policy for the three-year escrow period. *Id.* A Takeout Bonus could be released during the three-year period only to pay the claims of insureds, subject to the approval of the JUA. *Id.* Consistent with the restrictions imposed on an insurer's access to the escrowed Takeout Bonuses, Section 627.3511 provides that, during the escrow period, a Takeout Bonus remained the property of the JUA. *Id.* (Meder Depo. (Dkt. 158), pg. 148).

Section 627.3511(5)(a) imposed the further requirement that, once released to an insurer, the Takeout Bonus must be credited to the insurer's capital and surplus. *See* § 627.3511(5)(a), Fla. Stat. (1997); (Newman Depo. (Dkt. 159), pg. 19). Takeout Bonuses that were not earned by the insurer or previously paid out to satisfy claims of insureds were returned to the JUA. *See, e.g.,* Policy Takeout Agreement (Dkt. 1-6), pgs. 5-6.

<u>Southern Family Insurance Company</u>

SFIC was a private insurance company formed in 1996 to acquire insurance policies from the JUA.  (Meder Depo. (Dkt. 158), pgs. 20, 105).  After lengthy negotiations, the JUA transferred thousands of residential property insurance policies to SFIC.  (*Id.*, pg. 26, 41-42). SFIC took over the policies pursuant to several Policy Takeout Agreements, including certain amendments, (Dkt. 1-6; 1-7) and Portfolio Assumption Agreements, and amendments, (Dkt. 1-8, 1-9, 1-10, 1-11, 1-12, 1-13, 1-14) negotiated and executed by SFIC and the JUA.  In connection with SFIC's removal of the policies, the DOI issued consent orders prohibiting SFIC from paying dividend distributions without the prior consent of the DOI.  (Consent Orders (Dkt. 1-7), pg. 6; (Dkt. 1-15), pg. 7).   Any contracts with third-party advisors, service providers, or managing general agents required the approval of the DOI.  (Consent Orders (Dkt. 1-7), pgs. 3, 6-7; (Dkt. 1-15), pgs. 3, 7-8).  Finally, SFIC was prohibited from making any investments in, or advances to, an affiliated entity or individual without the prior approval of the DOI.  (Consent Orders (Dkt. 1-7), pg. 8; (Dkt. 1-15), pg. 8).  These provisions were designed to ensure that SFIC did not use its capital and surplus to pay dividends or otherwise benefit the owners or affiliates of the company.

During 1996-1999, the JUA deposited into escrow the following Takeout Bonuses for policies transferred to SFIC: $7,125,000.00 for 1996 (Meder Depo. (Dkt. 158), Ex. 6, pg. 11); $4,754,281.00 for 1997 (Meder Depo. (Dkt. 158), Ex. 6, pg. 11); $2,430,458.00 for 1998 (Meder Depo. (Dkt. 158), Ex. 6, pg. 11); and $832,100.00 for 1999 (Meder Depo. (Dkt. 158), Ex. 6, pg. 11).  All of these Takeout Bonuses were to remain in escrow for a three-year period.  The JUA deposited the Takeout Bonuses into a third-party escrow

account.  *See, e.g.,* Escrow Agreement (Dkt. 1-16).  During the escrow periods, SFIC could not cancel or elect not to renew any of the policies for the purpose of reducing its risk of hurricane losses.  *See* § 627.3511(5)(a), Fla. Stat. (1997).  SFIC was permitted to cancel or not renew up to three percent of the total number of the policies for other reasons if SFIC accepted, for each policy cancelled or not renewed, a similar replacement policy from the JUA within thirty days of the date of cancellation or non-renewal.  *See* § 627.3511(5)(a), Fla. Stat. (1997); (*E.g.,* Policy Takeout Agreement (Dkt. 1-7), pgs. 3-4).  At the end of each escrow period, SFIC was subject to an audit.  (*E.g.,* Takeout Bonus Review and Payment Agreement (Dkt. 1-11), pg. 3, and attached Audit Procedures).  If the audit revealed that SFIC canceled or elected not to renew a policy to reduce its risk of hurricane loss, the Takeout Bonus related to that policy, along with any investment income earned on that bonus, was returned to the JUA.  (*E.g.,* Policy Takeout Agreement (Dkt. 1-7), pgs. 5-6).  Likewise, if SFIC canceled or elected not to renew more than three percent of the policies for other reasons, or did not accept a replacement policy from the JUA, the escrowed Takeout Bonuses related to those policies were returned to the JUA.  (*Id.*).

SFIC could not access the Takeout Bonuses while they were in escrow.  (Meder Depo. (Dkt. 158), pg. 153).  The Takeout Bonuses remained the property of the JUA during the escrow periods.  § 627.3511(5)(a), Fla. Stat. (1997).  SFIC could not use the Takeout Bonuses for any other purpose, including as collateral for any loans or other obligations.  (Meder Depo. (Dkt. 158), pg. 153).  Moreover, the Takeout Bonuses were not considered by the State as part of SFIC's capital requirements prior to the date they were released from escrow to SFIC.  *See* § 627.3511(5)(a), Fla. Stat. (1997) (Newman Report, pgs. 15-16).

7

During the escrow periods, many policies were cancelled or not renewed.  As a result, at the end of the 1996-1999 escrow period, the escrow agent released to SFIC $6,876,500.00, an amount $248,500.00 less than the Takeout Bonuses initially deposited into escrow.  (Meder Depo. (Dkt. 158), pgs. 152-53, Ex. 6, pg. 11).  At the end of the 1997-2000 escrow period, the escrow agent released $4,859,913.00 to SFIC.  At the end of the 1998-2001 escrow period, the escrow agent released $2,392,590.00 to SFIC, an amount $37,868.00 less than the Takeout Bonuses initially deposited into escrow.  (Meder Depo. (Dkt. 158), pg. 153, Ex. 6, pg. 11).  At the end of the 1999-2002 escrow period, the escrow agent released to SFIC $394,050.00, an amount $438,050.00 less than the Takeout Bonuses initially deposited into escrow.  (Meder Depo. (Dkt. 158), pg. 153, Ex. 6, pg. 11).  These differences reflect Takeout Bonuses that were returned to the JUA, as well as other positive and negative adjustments made during the audits.  (Meder Depo. (Dkt. 158), pgs. 86-89).

SFIC did not ask for, and the JUA did not approve, the release of any escrowed Takeout Bonuses prior to the end of the escrow periods.  (Meder Depo. (Dkt. 158), pgs. 84-86).  SFIC accounted for the Takeout Bonuses released to it as a direct contribution to capital and surplus.  (Meder Depo. (Dkt. 158), pgs. 78-80; Newman Report, pg. 12).  The Takeout Bonuses paid by the JUA to SFIC became a permanent part of SFIC's capital. (Newman Report, pgs. 2, 12).

Tax Treatment of the Takeout Bonuses

During 1996-1998, PFG was the common parent of a group of corporations that included SFIC.  The consolidated group elected to file consolidated federal income tax returns for those years.  Consistent with the Treasury Regulations governing the filing of

8

consolidated returns, PFG filed the returns and was treated as the taxpayer for tax years 1996-1998.  SFIC filed a separate return for its 1999 tax year.

PFG excluded the Takeout Bonuses from income on the 1996-1998 returns. Consistent with the statutory requirement that the Takeout Bonuses become a part of the insurer's capital and surplus, PFG likewise treated the Takeout Bonuses as nonshareholder contributions to capital for tax purposes.  The United States now seeks partial summary judgment in its favor on the issue of whether the Takeout Bonuses constitute nonshareholder contributions to capital.

## ARGUMENT

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and must resolve all reasonable doubts against the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Jensen v. Turnage*, 782 F. Supp. 1527, 1528 (M.D. Fla. 1990).  If there are factual issues, the Court may not decide them, but must deny the motion.  *Anderson*, 477 U.S. at 255.

The United States' motion for partial summary judgment in this case must be denied.  At a minimum, genuine issues of material fact exist regarding whether the Takeout Bonuses paid by the State of Florida JUA constitute nonshareholder contributions to capital.  The United States concedes that, under the most recent authority from the United States Supreme Court and the United States Court of Appeals for the Eleventh Circuit, it is the intent of the JUA and the Florida Legislature in paying the Takeout Bonuses that determines whether the Takeout

9

Bonuses are nonshareholder contributions to capital.  The determination of a party's intent is a fact question that must be resolved by the finder of fact.  In short, the question of whether the Takeout Bonuses are nonshareholder contributions to capital turns on the factual determination of the intent of the JUA and the Florida Legislature.  The evidence in this case establishes that the JUA and the Florida Legislature intended the Takeout Bonuses to become a permanent part of the capital structure of the insurers participating in the program.  That evidence gives rise to disputed issues of material fact sufficient to preclude summary judgment in favor of the United States.

<u>Section 118(a)</u>

Title 26 U.S.C. § 118(a) provides that "[i]n the case of a corporation, gross income does not include any contribution to the capital of the taxpayer."  The term "contribution to capital" is not defined in the statute.  Treasury Regulation § 1.118-1, however, offers helpful guidance on the meaning of a nontaxable capital contribution.  Section 1.118-1 provides that the Section 118 exclusion applies to contributions made by persons other than shareholders of the corporation, and that the contributions may take the form of money.  *See* 26 C.F.R. § 1.118-1; *see also United States v. Coastal Utilities, Inc.*, 483 F.Supp.2d 1232, 1238 (S.D. Ga. 2007), *affirmed and adopted in full*, 514 F.3d 1184 (11th Cir. 2008).  The Treasury Regulation also explains that the Section 118 exclusion applies to money or property transferred to a corporation by a governmental unit for the purpose of inducing or enabling the corporation to expand its operations.  *See* 26 C.F.R. § 1.118-1.

The legislative history of Section 118 sheds additional light on the meaning of a nonshareholder contribution to capital.  The legislative history suggests that the exclusion is intended to apply to contributions of money or property that occupy a unique position.  On the one hand,

10

nonshareholder contributions to capital are not gifts because the transferor intends to derive some indirect benefit from the contributions. On the other hand, nonshareholder contributions to capital may not include payments for goods or specific, quantifiable services. The benefits to the transferor must be so intangible and indirect that they do not warrant treating the contributions as payments for future services. *See* S. Rep. No. 1622, 83rd Cong., 2d Sess. 18-19 (1954). An excludable non-shareholder contribution to capital occupies the middle ground between a gift and a payment for specified goods or services.

The United States Supreme Court and the Eleventh Circuit have instructed that the determination of whether a transfer of money or property constitutes a nonshareholder contribution to capital under Section 118(a) turns on the intent or motivation of the contributor. *See United States v. Chicago, Burlington & Quincy Railroad Co.*, 412 U.S. 401, 411-12 (1973); *Coastal Utilities*, 483 F.Supp.2d at 1239-41; *Deason v. Commissioner of Internal Revenue*, 590 F.2d 1377, 1378-79 (5th Cir. 1979). In the *Chicago, Burlington* case, the Supreme Court distilled from the prior case law a list of five factors that reflect "some of the characteristics of a nonshareholder contribution to capital." *Chicago, Burlington*, 412 U.S. at 413. Those factors include the following: 1) whether the payment becomes a permanent part of the transferee's working capital structure; 2) whether the payment is compensation for a specific, quantifiable service provided by the transferee to the transferor; 3) whether the payment is bargained for; 4) whether the asset transferred results in a benefit to the transferee commensurate with its value; and 5) whether the asset transferred will contribute to the transferee's production of additional income. *See Chicago, Burlington*, 412 U.S. at 413. In *Coastal Utilities*, the Eleventh Circuit clarified that these factors are "merely some" of the characteristics of a nonshareholder contribution to capital. The Court concluded that other

11

characteristics in a particular case may prove more helpful in determining the contributor's intent in making the contributions. *See Coastal Utilities*, 483 F.Supp.2d at 1250. Thus, the question of whether the Takeout Bonuses paid by the JUA constitute nonshareholder contributions to capital will turn exclusively on the fact finder's ultimate determination of the intent and motivation of the Florida Legislature and the JUA. In resolving that factual issue, the fact finder may, but is not required to, consider the five factors from *Chicago, Burlington.* PFG is not required to satisfy each of the five factors as a condition of demonstrating that the Takeout Bonuses are nonshareholder contributions to capital. *See Coastal Utilities*, 483 F.Supp.2d at 1250.

The issue presented in the United States' motion for partial summary judgment requires a determination of the intent of the JUA and the Florida Legislature in paying the Takeout Bonuses. Questions of intent, however, are fact questions that must be determined by the fact finder after trial. *See, e.g., Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991); *Seaboard Coastline Railroad Co. v. Trailer Train Co.*, 690 F.2d 1343, 1348-49 and n.8 (11th Cir. 1982); *United States v. Weisman*, 2008 WL 4790115, *7 (M.D. Fla. 2008). As a result, the Court must deny the United States' motion. The evidence in this case regarding the intent of the JUA and the Florida Legislature is sufficient to present a question for resolution by the fact finder. In fact, the evidence on this point is so clear and unequivocal it might well support the entry of summary judgment in favor of PFG.

The Intent of the JUA and the Florida Legislature

The clear intent of the JUA and the Florida Legislature was to contribute the Takeout Bonuses to the capital of private insurance companies in an effort to restore a competitive market for private property insurance in Florida. The Legislature and the JUA expressly

12

required that the Takeout Bonuses become part of the participating insurers' capital and surplus.  *See* § 627.3511(5)(a), Fla. Stat. (1997).  It is difficult to imagine a clearer statement of legislative intent than exists in this case.

The Florida Legislature and JUA articulated a compelling state interest in stabilizing the competitive market for private property insurance.  In fact, the Legislature recognized that the absence of available private property insurance in the State was endangering the health, safety, and welfare of its citizens.  The Legislature and the JUA further expressly articulated their intent to stabilize the market for private property insurance by paying Takeout Bonuses to participating insurers and by requiring that those Takeout Bonuses become part of the capital and surplus of the participating insurers.  In short, the Florida Legislature and the JUA articulated very clearly their intent to restore Florida's market for private property insurance by contributing to the capital of insurers like SFIC.  The Takeout Bonuses are a textbook example of nonshareholder contributions to capital.

In fact, the Florida Legislature's plan worked.  As a result of the payment of the Takeout Bonuses, competition developed among private insurers for policies previously written by the JUA.  (Meder Depo. (Dkt. 158), pg. 116).  Approximately 10 to 15 private insurance companies participated in the Takeout Bonus programs.  (Meder Depo. (Dkt. 158), pg. 142).  The payment of the Takeout Bonuses stimulated the competitive market for property insurance and more companies began to write insurance coverage in Florida.  (Meder Depo. (Dkt. 158), pg. 143).  As a result of the Takeout Bonuses, SFIC became a viable private insurance company capable of issuing additional policies providing property insurance coverage for Florida homeowners.  (Meder Depo. (Dkt. 158), pg. 116).

13

In its motion for partial summary judgment, the United States ignores the clearly articulated intent of the Florida Legislature and the JUA.  Instead, the United States contends that the Takeout Bonuses are not nonshareholder contributions to capital because they are payments made in exchange for services rendered.  According to the United States, the Takeout Bonuses were paid in exchange for the specific, identifiable service of removing a policy from the JUA.  The United States contends that the removal of a policy was itself a "service" to the JUA, separate from the provision of insurance coverage to the insured under the policy.  The United States' argument is not supported by the facts.  The only service provided by SFIC was the provision of property insurance coverage to the insureds under the policies.  SFIC provided no services to the JUA.  (Meder Depo. (Dkt. 158), pgs. 134-35).

The JUA did not pay the Takeout Bonuses to SFIC as consideration for its agreement to assume the JUA's coverage obligations under the policies.  First, with respect to the policies removed at their expiration, the JUA had no further obligations under the policies.  The policies had expired.  Thus, SFIC was providing no service or direct benefit to the JUA in writing coverage for those homeowners whose policies had expired for the simple reason that the JUA had no further obligations with respect to those policies.  Second, as to the policies removed by SFIC prior to their expiration, the numerous additional conditions imposed on SFIC's receipt of the Takeout Bonuses demonstrate quite clearly that the Takeout Bonuses were *not* paid by the JUA in exchange for SFIC's agreement to assume the JUA's obligations under those polcies.  For example, SFIC was required to maintain coverage under the policies for three years; the JUA was not.  SFIC was prohibited from cancelling or refusing to renew a policy to reduce its hurricane risk; the JUA was not.  SFIC was

prohibited from failing to renew more than three percent of the policies for any other reason; the JUA was not. (Meder Depo. (Dkt. 158), pg. 162). The conditions imposed on SFIC's receipt of the Takeout Bonuses were not part of the JUA's obligations under the policies, and therefore establish that the Takeout Bonuses were not payments made in exchange for the purported service of assuming the JUA's obligations under the policies. Finally, SFIC was required to remove the policies from the JUA long before it received payment of the Takeout Bonuses. SFIC did not receive a Takout Bonus until three years after it assumed the policy from the JUA. During that time, SFIC could forfeit a Takeout Bonus despite SFIC's provision of coverage under the policy for the remainder of its original term. That is, SFIC could assume a policy from the JUA and satisfy all of the JUA's obligations under that policy, but still not receive a Takeout Bonus in connection with that policy.

In addition, the Takeout Bonuses in this case were not part of the price charged SFIC's customers for their insurance coverage. Simply stated, the Takeout Bonuses were not paid to SFIC as part of the price it charged for the provision of insurance coverage under the policies. Instead, as separate consideration for assuming an unexpired policy from the JUA, the JUA paid to SFIC the remaining unearned insurance premium associated with the policy. (Newman Depo. (Dkt. 159), pgs. 16-18; Meder Depo. (Dkt. 158), pgs. 28-29, 38-40). The JUA transferred cash to SFIC equal to the amount of the unearned premium. (Meder Depo. (Dkt. 158), pg. 29). For example, if three months remained on a six-month policy, the JUA paid SFIC one half of the premium charged for the policy. (Newman Depo. (Dkt. 159), pgs. 16-18). The unearned premium was SFIC's consideration for assuming the coverage risk from the JUA and agreeing to pay claims arising under the policy. (Meder Depo. (Dkt. 158),

15

pg. 29). The unearned premium was also designed to allow SFIC some profit. (Meder Depo. (Dkt. 158), pg. 29). As the insurers provided coverage for the term of the policy, they "earned" the remainder of the premium on the policy and, depending on the existence of any claims under the policy, either enjoyed a profit or suffered a loss. (Newman Depo. (Dkt. 159), pg. 19). The unearned premium was the only payment SFIC received in exchange for assuming the JUA's obligations under a policy.

The unearned premiums on the in-force JUA policies were very attractive to insurers like SFIC because the JUA was permitted to charge rates in excess of the market rates the State allowed private insurers to charge. *See* § 627.351(6)(d)1, Fla. Stat. (Newman Report, pgs. 9-10). Thus, the unearned premiums on the in-force policies removed from the JUA were higher than the premiums on similar policies sold by private insurers. For JUA policies removed upon their expiration, SFIC simply received the amount of premium it was permitted by the State to charge for the new policy. The Takeout Bonuses were not a factor in rate of return permitted to SFIC or in the amount of premium it was permitted to charge.

Finally, the Takeout Bonuses were not paid in exchange for any direct benefit conveyed on the JUA. It is important to note that the JUA did not have any economic interests independent of the State of Florida. *See Florida Residential Property and Casualty Joint Underwriting Association v. United States of America*, 207 F.Supp.2d 1344, 1354-55 (N.D. Fla. 2002). The JUA was a creation of the State and was designed to go out of business as quickly as possible. *Id.* In authorizing the Takeout Bonuses, the Florida Legislature was not motivated by a concern for the welfare or success of the JUA as an insurance provider. (Newman Report, pg. 2). According to the General Counsel of the DOI,

16

the payment of the Takeout Bonuses served a very broad public purpose and was intended to benefit the entire State. (Newman Report, Ex. L). The Takeout Bonuses were designed to induce the infusion of additional capital into Florida's private property insurance market and thereby stabilize the market for the benefit of all of the citizens of the State. *Id.* There was no intent to provide any direct benefit to the JUA.

The Remaining <em>Chicago, Burlington</em> Factors

An examination of the remaining *Chicago, Burlington* factors confirms that the intent of the Florida Legislature and the JUA was to contribute the Takeout Bonuses to the capital of the participating insurers.[3] First, all of the Takeout Bonuses paid to SFIC became a permanent part of SFIC's capital and surplus. (Meder Depo. (Dkt. 158), pgs. 120- 22; Newman Report, pgs. 2, 12). The Takeout Bonuses received by SFIC were not treated as income on the company's books and records. (Meder Depo. (Dkt. 158), pg. 133). SFIC did not pay, and was not assessed, Florida premiums tax or Florida corporate income tax on the Takeout Bonuses. (Meder Depo. (Dkt. 158), pgs. 133-34); *see also* § 627.3511(5)(a), Fla. Stat. (1997). The Takeout Bonus payments were permanently invested as part of SFIC's working capital. (Meder Depo. (Dkt. 158), pgs. 123-24).

The United States contends that the Takeout Bonuses are not contributions to capital because, following their release from escrow, they were deposited into an operating account along with premium receipts, and used by SFIC, in part, to pay claims and other expenses. In addition, the United States points to the fact that the JUA did not impose restrictions on SFIC's use of the Takeout Bonuses following their release from escrow – except, of course,

---

[3] The payment for services factor is discussed above.

that the Takeout Bonuses were required to become part of SFIC's capital structure. The law is clear that a payment of money may constitute a contribution to capital even where there is no restriction imposed on the recipient's use of the money. *See Brown Shoe Co. v. Commissioner of Internal Revenue*, 339 U.S. 583, 587 (1950); *Coastal Utilities*, 483 F.Supp.2d at 1246. In *Brown Shoe*, transfers of cash were deposited into the taxpayer's general operating bank account and used to pay general operating expenses. The payments were credited to earned surplus. The Court nonetheless found that the cash payments were nonshareholder contributions to capital. Similarly, the *Chicago, Burlington* decision contemplates that the contributions are to become a permanent part of the taxpayer's ***working*** capital.

The United States appears to argue that, because cash is fungible, it can never constitute a nonshareholder contribution to capital. The United States cites no authority for this proposition, and the well-established law is all to the contrary. Moreover, the United States' argument also reflects a fundamental misunderstanding of the character and operation of an insurance company. The capital structure of an insurer is its capital and surplus – not bricks and mortar. An insurer does not make capital investments in factories or facilities. Instead, an insurer grows and expands its capacity for issuing policies by increasing the amount of cash in its capital and surplus. The amount of business an insurer may write depends on the amount of its capital and surplus. (Newman Report, pgs. 12, 15). Thus, the payment of cash Takeout Bonuses to SFIC, accompanied by a requirement that those Takeout Bonuses be credited to capital and surplus, is a direct contribution to the capital of SFIC.

The next factor considers whether the contribution was "bargained for." The United States contends that the Takeout Bonuses were not "bargained for" because the amount of each Takeout Bonus was calculated using a formula developed by the JUA, and was not

18

negotiated individually.  The court in *Coastal Utilities* recognized that this factor has little applicability to cases involving the payment of government subsidies because the amount of a government subsidy is seldom the subject of negotiation by the recipient.  In this case, the evidence establishes that SFIC and the JUA bargained for the Takeout Bonuses.  James Newman, the Executive Director of the JUA, confirms that the programs under which SFIC received the Takeout Bonuses were bargained for.  (Newman Report, pg. 2).  In addition, as part of its application to participate in the programs, each insurer submitted extensive takeout plans or proposals.  The terms of those plans were the subject of discussions, negotiations, and modifications.  (Newman Report, pg. 14).  SFIC and the JUA negotiated the terms of SFIC's application and participation in the Takeout Bonus programs, including the number of policies SFIC was to remove, the selection of the particular policies, and whether the policies would be removed as they expired or at a single point in time.  ((Meder Depo. (Dkt. 158), pgs. 26, 41-42, 138).  These negotiations were driven by the amount of Takeout Bonus paid for different types of policies.  (Meder Depo. (Dkt. 158), pgs. 138-39).

The fourth factor examines whether the asset transferred will result in a benefit to the transferee in an amount commensurate with its value.  In the view of SFIC and the JUA, the value of the cash Takeout Bonuses was commensurate with the benefit SFIC received.  (Meder Depo. (Dkt. 158), pgs. 139-40; Newman Report, pg. 2).  The United States agrees.

The final factor is whether the Takeout Bonuses contributed to SFIC's production of additional income.  The Takeout Bonuses were intended to be incentives to grow the private insurance market in Florida.  If an insurer's plan did not reflect that the Takeout Bonuses were promoting the growth and expansion of the insurer's Florida property insurance

19

business, the DOI would reject the insurer's participation in the program.  SFIC used the

Takeout Bonuses to expand its business and generate additional income.  As SFIC's capital

and surplus increased due to the Takeout Bonuses, the regulator authorized SFIC to write

additional policies.  (Newman Report, pg. 15).  The Takeout Bonuses allowed SFIC to

produce additional income by expanding its capital structure and thereby enabling it to

assume greater risk through the issuance of additional policies.  (Meder Depo. (Dkt. 158),

pgs. 170, 173-74).  As the court explained in *G.M. Trading Corp. v. Commissioner of*

*Internal Revenue*, 121 F.3d 977, 981 (5th Cir. 1997), "[a] payment to induce investment is

the quintessential nontaxable contribution to capital."

## CONCLUSION

At a minimum, the evidence adduced in this case presents a fact question regarding

the intent and motivation of the JUA and the Florida Legislature in paying the Takeout

Bonuses.  As a result, the Court must deny the United States' motion for partial summary

judgment.

Respectfully submitted,

s/ Stacy D. Blank
Douglas A. Wright
Trial Counsel
Florida Bar No. 608490
doug.wright@hklaw.com
Stacy D. Blank
Florida Bar No. 772781
stacy.blank@hklaw.com
Holland & Knight LLP
P.O. Box 1288
Tampa, Florida 33601
(813) 227-8500
(813) 229-0134 (Fax)
Attorneys for Poe Financial Group, Inc.

20

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 23, 2010 I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to the following:

Richard A. Alayon -ralayon@alayonlaw.com
Christopher G. Berga - cgb@lydeckerlaw.com
Jody Elizabeth Collins  - jody.collins@fldfs.com
Patrick J. Hannon - Patrick.J.Hannon@usdoj.gov,southern.taxcivil@usdoj.gov
Esperanza Segarra  - es@lydeckerlaw.com
State of Florida, Department of Financial Services
ralayon@alayonlaw.com
Michael N. Wilcove - Michael.N.Wilcove@usdoj.gov,Southern.taxcivil@usdoj.gov
Carlos Luis de Zayas - cdz@lydeckerlaw.com,dm@lydeckerlaw.com

/s/ Stacy D. Blank

# 9201495_v1

21