# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**SOUTHERN FAMILY INSURANCE COMPANY,**

       **Plaintiff,**

**v.**                                                              **Case No.  8:05-cv-2158-T-30MAP**

**UNITED STATES OF AMERICA,**

       **Defendant.**

_____/

## PARTIAL FINAL JUDGMENT

In this case, Plaintiffs Southern Family Insurance Company ("Southern Family") and Poe Financial Group, Inc. ("Poe Financial") filed claims against Defendant the United States of America (the "United States") for tax refunds associated with taxes paid on takeout bonus payments paid by the State of Florida Residential Property and Casualty Joint Underwriting Association ("JUA").  The issue of whether the takeout bonuses were nonshareholder contributions to capital, and thus excludable from gross income, was tried by the Court without a jury on November 1 and 2, 2010.  For the reasons set forth herein, the Court finds that it was the intent of the contributor to characterize the takeout bonuses as capital contributions.  Thus, Plaintiffs are entitled to a partial final judgment in their favor on this issue.

## BACKGROUND AND FINDINGS OF FACT

Following the aftermath of Hurricane Andrew in 1992, a number of property and casualty insurers ceased writing and/or renewing windstorm insurance policies in Florida. As a result, the State of Florida (the "State") and its residents faced an insurance crisis. In response to the crisis, the State passed legislation creating the Residential Property and Casualty Joint Underwriting Association (the "JUA") as a windstorm insurer of last resort.

Although it was intended to be an insurer of last resort, the JUA's business grew rapidly. After only 18 months of operation, the JUA had become the third largest property insurer in Florida. And by the fall of 1996, the JUA had nearly 1,000,000 policies in force. In order to encourage private insurers to re-enter the marketplace, the State passed further legislation, codified at section 627.3511, Florida Statutes, to encourage the transfer of property insurance policies from the JUA to private insurers.

Pursuant to the legislation, the State provided what it referred to as takeout bonuses to private insurers for each risk they removed from the JUA. *See* Fla. Stat. § 627.3511. The bonuses were not, however, immediately paid to the private insurers. Instead, the payments were paid into an escrow account (the "Escrow Account") pursuant to the terms of the statute and an escrow agreement among the State, the JUA, and a third-party trustee. Under this arrangement, the trustee was allowed to release the bonuses to the private insurers only after certain terms were met.

Generally, insurers were required to provide coverage under a policy for three years before the corresponding funds were released. Upon expiration of that three-year period, the

JUA would conduct an audit to determine whether the insurer had provided coverage under the applicable policies and otherwise complied with the statute. Following the audit of a private insurer, the bonuses, together with accrued interest, were released to the insurer. Any portion of the funds deemed not payable to the insurer would be returned to the JUA.

The Florida Legislature provided that the takeout bonuses could be paid in amounts up to $100 each. The Executive Director of the JUA, James Newman ("Newman"), developed a formula for determining the amount of the takeout bonus to be paid for each type of policy. The amount was not based on any consideration of, or desire to provide, increased revenue or a stated rate of return on investment to participating insurers. Instead, the amount of a particular bonus depended generally on whether the policy provided windstorm coverage and the location of the insured property. The amount of the bonus did not depend on the value of the property insured, the amount of coverage provided, the insurance premium charged for the policy, or the insurer's expected profit or loss on the policy. For example, the bonus was the same for a $100,000 home as for a $1,000,000 home. This program successfully attracted many new insurance companies to provide coverage in Florida.

Plaintiff Southern Family Insurance Company ("Southern Family") was formed in 1996 to write residential insurance policies and participate in the JUA policy takeout program. Southern Family ultimately took over thousands of policies from the JUA. As a result, the JUA deposited takeout bonuses into the Escrow Account. The takeout bonuses relevant to the instant action were deposited by the JUA into the Escrow Account during the calendar years 1996-1999.

Southern Family and the JUA entered into several different takeout agreements. They entered into a Policy Takeout Agreement ("PTA") on July 17, 1996. Subsequently, they entered into a related Portfolio Assumption Agreement ("PAA"), as well as numerous amendments and addenda which provided for the assumption of additional policies. On May 1, 1998, they entered into the Market Challenge Portfolio Assumption Agreement ("MCA"), and on July 30, 1998, the 1998 Coastal Countdown Portfolio Assumption Agreement ("CCA").

The terms and conditions of these agreements were substantially similar to those in Section 627.3511. Southern Family applied to participate in a program by submitting a proposed takeout plan. Southern Family would forfeit all of the takeout bonuses and earnings if it failed to remove at least 25,000 policies from the JUA. If Southern Family failed for a period of thirty days to maintain coverage for at least 25,000 policies, Southern Family would forfeit all of the takeout bonuses and earnings under the PTA. The CCA required Southern Family to remove 5,000 policies as a condition of receiving any takeout bonuses under that program. The JUA did not guarantee that Southern Family would be able to secure a sufficient number of policies to qualify for the payment of takeout bonuses.

The JUA deposited takeout bonuses into a third-party escrow account pursuant to an Escrow Agreement between the JUA and Southern Family. Under the Escrow Agreement, the escrow agent could disburse funds only pursuant to written directions from the JUA. The escrow agent could release funds for the payment of claims to insureds upon the receipt of joint written direction from the JUA and Southern Family. Southern Family could direct the

escrow agent to invest the escrowed funds in obligations of specific categories of investments enumerated in the Escrow Agreement.  If Southern Family failed to provide direction, the escrow agent was required to invest the funds in the same categories of investments.  All investments were to be made in the name of the escrow agent.

At the end of the escrow period, Southern Family was entitled to a takeout bonus if it had provided coverage under the removed policy for the three-year escrow period.  During this three-year period, Southern Family could not cancel or elect not to renew any of the policies for the purpose of reducing its risk of hurricane losses.  Southern Family was permitted to cancel or not renew up to three percent of the total number of the policies for other lawful reasons as long as it accepted a similar replacement policy from the JUA. Southern Family could not access the takeout bonuses while they were in escrow.  Further, section 627.3511(5)(a) provided that the takeout bonuses remained the property of the JUA during the escrow period.  Section 627.3511(5)(a) also required the takeout bonus, once released to an insurer, to be credited to the insurer's capital and surplus.

At the end of each escrow period, Southern Family was subject to an audit and a recalculation of the takeout bonus amounts to which it was entitled.  A second review and recalculation was conducted by the JUA prior to the release of any escrow earnings to Southern Family at the end of the last escrow period for a program.  The JUA retained the right to further adjust the amount of earnings released to Southern Family based on this second review and recalculation.

If the audit revealed that Southern Family canceled or elected not to renew a policy to reduce its risk of hurricane loss, the takeout bonus related to that policy, along with any income earned on that bonus, remained the property of the JUA. If Southern Family canceled or elected not to renew more than three percent of the policies for other reasons, or did not accept a replacement policy from the JUA, the escrowed takeout bonuses related to those policies remained the property of the JUA. Southern Family was entitled to receive any earnings on the escrowed funds upon the release of the last takeout bonus associated with a particular program.

During 1996-1999, the JUA deposited into escrow the following takeout bonuses for policies transferred to Southern Family: $7,125,000 for 1996; $4,754,281 for 1997; $2,430,458 for 1998; and $832,100 for 1999. During the escrow periods, many policies were cancelled or not renewed. As a result, at the end of the escrow periods, the escrow agent released to Southern Family: $6,876,500 for 1996; $4,859,913 for 1997; $2,392,590 for 1998; and $394,050 for 1999.

In 1999, the JUA approved the first release of funds to Southern Family. These funds related to the policies "taken out" by Southern Family during the 1996 taxable year. Southern Family accounted for these takeout bonuses as a direct contribution to capital and surplus and did not report the same as taxable premium income on its 1999 federal income tax return.

For the tax years 1996-1998, Southern Family did not file a stand-alone tax return. Instead, Plaintiff Poe Financial Group, Inc. ("Poe Financial"), the common parent of a group

of corporations that included Southern Family, filed a consolidated return.  For the 1999 tax year, Southern Family was not a member of the consolidated group and filed a separate stand-alone return.

Following examination of the consolidated tax returns for 1996-1998, together with Southern Family's 1999 return, the Internal Revenue Service ("IRS") issued notices of deficiency to Poe Financial for 1996-1998 and Southern Family for 1999.  The IRS determined that Poe Financial and Southern Family had improperly treated the takeout bonus payments as capital contributions and therefore had erroneously excluded the payments from gross income.  Southern Family paid the amount of the deficiency for the relevant tax years (1996-1999).  Seeking return of the taxes paid to satisfy the deficiency, Poe Financial filed an administrative refund claim for tax years 1996-1998, and Southern Family filed a separate administrative refund claim for 1999.  The IRS denied both administrative refund claims. The IRS determined that the takeout bonuses were included in income in the years in which Southern Family removed the policies from the JUA, not when the amounts were distributed from escrow, and that the escrow earnings were included in the year in which they were credited to the escrow account.

Subsequently, Poe Financial and Southern Family filed separate actions against the United States for refund of the same taxes paid on the bonus payments, plus accrued interest, for the years 1996-1998.  Southern Family also filed a separate refund action against the

United States in connection with taxes paid on the bonus payments for 1999.  These separate actions were consolidated into the instant action on November 7, 2007.[1]

On July 26, 2010, the Court entered partial summary judgment in favor of Plaintiffs on the issue of timing, i.e., that the takeout bonuses and interest did not accrue as income until they were released from escrow (Dkt. 289).  This issue was only relevant, however, if the Court later ruled that the takeout bonuses should not have been characterized as capital contributions, and is now moot, because the Court concludes that they were appropriately characterized as nonshareholder capital contributions as set forth herein.

## DISCUSSION

Section 61(a) of the Internal Revenue Code provides a broad definition of "gross income": "Except as otherwise provided in this subtitle, gross income means all income from whatever source derived."  26 U.S.C. § 61(a).  The Supreme Court has emphasized that the "sweeping scope" of this section reflects Congress's intent to exert the full measure of its taxing power.  *Comm'r v. Schleier,* 515 U.S. 323, 327-328, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995); *Helvering v. Clifford,* 309 U.S. 331, 334, 60 S.Ct. 554, 84 L.Ed. 788 (1940).  The corollary to § 61(a)'s broad construction is the "default rule of statutory interpretation that exclusions from income must be narrowly construed."  *Schleier,* 515 U.S. at 328, 115 S.Ct.

---

[1]Prior to filing of the now consolidated lawsuits, Poe Financial filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code in *In re Poe Financial Group, Inc.*, Case No. 8:06-bk-04288-CPM, and Southern Family was placed into receivership by the State of Florida, Department of Financial Services.  *See State of Florida, ex rel., The Department of Financial Services of the State of Florida v. Southern Family Insurance Company*, Case No. 2006-CA-1060 (Fla. 2d Jud. Cir.).

2159 (*quoting United States v. Burke,* 504 U.S. 229, 248, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992) (Souter, J., concurring in judgment)).

Section 118(a) excludes from gross income "any contribution to the capital of the taxpayer." 26 U.S.C. § 118(a). Treasury Regulation 1.118-1 provides that a contribution to capital can be either money or property and that this can apply to contributions made by both shareholders and nonshareholders. 26 C.F.R. § 1.118-1. With regard to nonshareholder contributions to capital, § 1.118-1 offers contrasting examples:

> For example, the exclusion applies to the value of land or other property contributed to a corporation by a governmental unit or by a civic group for the purpose of inducing the corporation to locate its business in a particular community, or for the purpose of enabling the corporation to expand its operating facilities. However, the exclusion does not apply to any money or property transferred to the corporation in consideration for goods or services rendered, or to subsidies paid for the purpose of inducing the taxpayer to limit production.

26 C.F.R. § 1.118-1.

United States Supreme Court and Eleventh Circuit precedent are instructive on the issue of whether the takeout bonuses provided to Southern Family in this case constitute nonshareholder contributions to capital. *See United States v. Chicago, Burlington & Quincy Railroad Co.*, 412 U.S. 401 (1973); *United States v. Coastal Utilities, Inc.*, 483 F. Supp. 2d 1232 (S.D. Ga. 2007), *affirmed and adopted in full*, 514 F.3d 1184 (11th Cir. 2008). These cases held that the determination of whether a transfer of money or property constitutes a nonshareholder contribution to capital under Section 118(a) turns on the intent or motivation of the contributor. *Id.*

In reviewing the origins of the "contributor motivation test," the Eleventh Circuit

discussed Supreme Court precedent:

> [T]he Court soon moved away from the functional use test articulated
> by *Cuba Railroad,* developing a subjective, contributor motivation test in
> *Detroit Edison Co. v. Commissioner,* 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286
> (1943) and *Brown Shoe Co. v. Commissioner,* 339 U.S. 583, 70 S.Ct. 820, 94
> L.Ed. 1081 (1950).  *This test focuses on the intent of the contributor rather
> than the function of the payments.*  In *Detroit Edison,* the Court held that
> payments made by prospective customers of an electric company to cover the
> cost of extending the utility's facilities to the customers' homes were part of
> the price of services and not contributions to capital.  319 U.S. at 103, 63 S.Ct.
> 902.  Because the transferors made the payments with the intention of
> receiving a direct benefit in the form of specific services, the payments could
> not be considered a contribution to capital.  The Court concluded, "[I]t
> overtaxes the imagination to regard farmers and other customers who
> furnished these funds as makers either of donations or contributions to the
> Company.  The transaction neither in form nor substance bore such a
> semblance."  *Id.* at 102, 63 S.Ct. 902.

> The Court followed the contributor motivation test again seven years
> later in *Brown Shoe,* holding that the location inducements at issue were
> contributions to capital.  339 U.S. at 592, 70 S.Ct. 820.  The dispute involved
> transfers of cash and other property made by civic groups to induce the
> taxpayer to build and operate facilities in their communities or expand the
> facilities already there.   In holding that the assets transferred were
> contributions to capital, the Court distinguished *Detroit Edison* on the basis of
> the contributor's motivating purpose behind the transaction.  In *Detroit Edison,*
> the transferors were customers who paid for the services they received, and the
> payments were made in exchange for those services.  But in *Brown Shoe,* the
> contributors were community groups who were not paying for any specific
> goods or services. Instead, they expected only that the transactions would
> benefit the community at large by providing jobs.  Justice Clark, writing for
> the majority, stated that in *Brown Shoe* there were "neither customers nor
> payments for service," and that therefore the Court "may infer a different
> purpose in the transactions between petitioner and the community group."  *Id.*
> at 591, 70 S.Ct. 820.

*Coastal Utilities,* 483 F. Supp. 2d at 1239 -1240 (emphasis added).

In the *Chicago, Burlington* case, the Supreme Court distilled from *Detroit Edison* and *Brown Shoe* "some of the other characteristics of a nonshareholder contribution to capital." *Coastal Utilities,* 483 F. Supp. 2d at 1240 -41 (*citing Chicago, Burlington* 412 U.S. at 413). The Court listed five such characteristics:

> [1] It certainly must become a permanent part of the transferee's working capital structure. [2] It may not be compensation, such as a direct payment for a specific, quantifiable service provided for the transferor by the transferee. [3] It must be bargained for. [4] The asset transferred foreseeably must result in benefit to the transferee in an amount commensurate with its value. And [5] the asset ordinarily, if not always, will be employed in or contribute to the production of additional income and its value assured in that respect.

*Id*.  The Eleventh Circuit clarified that these factors are "merely some" of the characteristics of a nonshareholder contribution to capital and that other characteristics in a particular case may prove more helpful in determining the contributor's intent in making the contributions. *See Coastal Utilities*, 483 F. Supp. 2d at 1250.

In this case, the Court finds that it was the intent and motivation of the Florida Legislature and the JUA for the takeout bonuses to constitute nonshareholder contributions to capital.  This is reflected in the language of the Florida Statute, which expressly requires an insurer to credit the takeout bonuses to the insurer's capital and surplus.  Section 627.3511(5)(a). Also, Newman, who was involved in drafting and implementing the takeout bonus legislation, testified that the express language in the statute reflected the Legislature's intent that the takeout bonuses become part of the insurer's paid-in capital, and not be treated as income.

There were good reasons behind this intent. Newman explained that the Florida Legislature identified the bonuses as an incentive to bring capital into Florida to create companies that would provide insurance coverage to homeowners in Florida. Money added to capital increases the underwriting capacity of an insurer. And, without the permission of the Florida Insurance Commission, capital cannot be used to pay dividends. If the bonuses were subject to federal income tax, the benefit of increased underwriting capacity, Florida's goal, would be reduced.

Like most other states, Florida has adopted specialized accounting principles that insurance companies must apply when filing statutory financial statements. Steven Szypula ("Szypula"), Chief Financial Analyst for Florida's Office of Insurance Regulation, testified that, in addition to Section 627.3511, Florida's statutory accounting principles, particularly Statutory Accounting Principle 72, required Southern Family to report the takeout bonuses as a credit to capital and surplus and did not permit the bonuses to be treated as an item of income or revenue. And Joseph Miller ("Miller"), one of the Government's experts, acknowledged that the Florida Department of Insurance's accounting principles required the takeout bonuses to be credited to capital and surplus and not be treated as an item in the income portion of Southern Family's balance sheet.

The evidence presented at trial also established that the five characteristics of a nonshareholder contribution to capital set forth in *Chicago, Burlington* are reflected in Southern Family's treatment of the takeout bonuses. As already discussed, the statutory

language and the testimony of Newman and Szypula demonstrated that the takeout bonuses became a permanent part of Southern Family's capital.

The evidence presented at trial also demonstrated that the takeout bonuses were not compensation for a specific, quantifiable service. Newman and James Meder ("Meder") testified that Southern Family did not provide any services to the JUA for the removal of the policies. The services connected to the risks assumed were to the policyholders. And the takeout bonuses were not based on any actuarial analysis.

In addition, the evidence established that the takeout bonuses were bargained for because the parties engaged in negotiations concerning the takeout arrangements. And because the bonuses were paid in cash, the benefits received were commensurate with the value of the bonuses.

Finally, Meder and Newman's testimony demonstrated that the takeout bonuses contributed to the production of additional income. The evidence showed that the bonuses increased the participating companies' ability to write more business, which was the purpose of the program. These facts are similar to the facts in *Brown Shoe,* discussed above, in that the JUA, like the community groups, was not paying for any specific good or service, but expected only that the takeout bonus would benefit the Florida insurance market, i.e., the bonuses encouraged private insurance companies to invest their capital in the Florida insurance market.

Accordingly, for all the foregoing reasons, the Court finds that the takeout bonuses were nonshareholder contributions to capital and thus excludable from gross income, and the

taxpayers are entitled to recover a refund of any amounts erroneously assessed and paid.

Partial final judgment is hereby rendered in favor of Plaintiffs and against Defendant on this

issue.

It is therefore ORDERED AND ADJUDGED that:

1.    The CLERK is directed to enter Partial Final Judgment in favor of Plaintiffs

and against Defendant as set forth herein.

2.    This case shall remain open to determine the issue of ownership (between the

Plaintiffs) of the tax refunds, and the amount of the refund and any NOL

carryforwards due for each year.

**DONE** and **ORDERED** in Tampa, Florida on December 1, 2010.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2005\05-cv-2158.partial FJ.frm